

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

RJN
F.#2009R01167

*271 Cadman Plaza East*
*Brooklyn, New York  11201*

January 25, 2012

**BY HAND AND ECF**

The Honorable Eric N. Vitaliano
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

       Re:  United States v. Jerome Caramelli
             Criminal Docket No. 10-0010 (S-5) (ENV)

Dear Judge Vitaliano:

       The government respectfully submits this letter in response to the defendant's sentencing submission ("Def. Let."), dated January 19, 2012.  Caramelli is scheduled to be sentenced by the Court on January 27, 2012 at 11:00 am.

I.    Background

       On January 10, 2011, the defendant pled guilty pursuant to a plea agreement ("Plea Agreement") to Counts Ten and Eleven of a superseding indictment charging him with illegal gambling, in violation of 18 U.S.C. § 1955 and extortionate collection of credit conspiracy, in violation of 18 U.S.C. § 894(a)(1).

       The charges stemmed from an investigation into the activities of members and associates of La Cosa Nostra, and in particular, in Caramelli's case, the involvement of members and associates of the Bonanno organized crime family of La Cosa Nostra (the "Bonanno family") in loan sharking and illegal gambling operations.

       The investigation revealed that Caramelli was an associate of co-defendant Anthony Mannone, a captain in the Bonanno family.  As detailed in the Probation Department's Presentence Investigation Report ("PSR") and as set forth below, Mannone and Caramelli were involved in operating a gambling business and in threatening a cooperating witness ("CW1") when he failed to pay a gambling debt owed to Caramelli.  PSR ¶ 28-29.

A. <u>The Extortionate Collection of Credit Conspiracy</u>

Between 2008 and 2009, Caramelli used repeated threats of violence in an effort to collect a $193,000 debt from CW1. The debt arose after CW1 referred two bettors to the gambling operation run by Caramelli and Mannone. When the bettors lost, Mannone and Caramelli held CW1 responsible for repaying their debt. First, Mannone communicated a threat on CW1's life through another Bonanno associate who later began cooperating with the government ("CW2"). PSR ¶ 30. CW2 advised CW1 that Mannone had directed Caramelli to hurt or kill CW1. Subsequently, on January 23, 2009, Caramelli attended a meeting or "sit-down" organized by Mannone, which was consensually recorded by CW1. During the sit-down, Mannone demanded that CW1 collect the money from the two bettors, stating,

> I could have went a different route, I'm not here to go that route. I'm here as a f-in' friend. . . . and in our life, our friend . . . . What I want from you in front of your man here, I want you to go get this f--in' money and bring it to them. Matter of fact, bring it to me . . . . And this is on record between us.

PSR ¶ 32. Mannone used the terms "friend," "our life" and "on record," to communicate an implicit threat to CW1 about future retaliation by the Bonanno family if CW1 did not comply.

Subsequently, Caramelli communicated overt threats to CW1 about what Mannone intended to do to CW1 if he failed to repay. In a recorded conversation on February 6, 2009, Caramelli stated:

> I want my fucking money. . . .Why would you take your friend [referring to Mannone] and make him your enemy. . . .He told me to tell you, you got 24 hours to get in touch with him. . . .I know for a fact he's f-in prepared. . . .you haven't even put up shut up money. You haven't even went to give him 30 or 40 thousand. . . .

PSR ¶ 33.

Shortly thereafter, on February 16, 2009, Caramelli attended a second sit-down with Mannone, which CW1 consensually recorded. During that meeting, Mannone stated:

2

> You know you owe the money, go get the money
> from them guys and bring us the money. Go
> get your gun and go get your knife and put
> your mask on, and go rob like you told my guy
> [Caramelli] to rob and you got paid . . . .
> you said it right here in front of Sal
> [Cutaia] I will take care of this money, I'll
> take care of these guys . . . . I want this
> thing put to bed. And listen to me, I, I
> told you in front of the other guy you came
> with, the last time with him, don't start
> bringing a thousand dollars a week . . . .
> I'm not waiting for $1000 a week at 193
> . . . . and I'm gonna tell you another thing
> in front of Carlo [Profeta], once you
> introduced Jerry [Caramelli] to these guys
> I'm not taking you off the hook. You're
> gonna collect this money with them, the 193.

PSR ¶ 36.

When the payment was not forthcoming after this meeting, on February 22, 2009, Caramelli again threatened CW1 in an effort to collect to the debt.

> Tomorrow, all shit is going to break loose
> . . . . Ant [Mannone], he's beyond f-in
> twisted right now . . . . The only thing I
> could've gone to him with was if you had
> something significant . . . . he's tried to
> do it the nice way . . . . he's got to the
> point now where it's time. . . .he told me to
> return your call. . . . and if you had
> something significant he said then come to
> him and then we'll be civilized. . . . I hate
> to say it, you're not someone I'm trying to
> f-in put a scare into because I don't need to
> do that, you know, this is not good. . . . he
> already made the decision this is not gonna
> end good.

PSR ¶ 37. Shortly thereafter, in order to protect CW1's safety, the FBI warned Caramelli that CW1 was cooperating with the government.

    B.    <u>Illegal Gambling</u>

Caramelli was responsible for handling the daily and weekly operations of the gambling business that he ran with

3

Mannone. For example, Caramelli met on a weekly basis with individuals such as CW2, who brought bettors to the gambling operation and were required to share with Caramelli a percentage of any profits those bettors generated. PSR ¶ 53. During several meetings consensually recorded by CW2 between March and April 2009, Caramelli collected payments from CW2 and discussed the outstanding balance that CW2 owed. PSR ¶ 54.

II. The Presentence Investigation Report

According to the PSR, the defendant's total offense level is 19. PSR ¶ 167. With a criminal history category of I, the corresponding range of imprisonment under the United States Sentencing Guidelines (the "Guidelines" and "U.S.S.G.") is 30 to 37 months. PSR ¶¶ 171, 212. This calculation differs from the calculation in the Plea Agreement because the PSR includes a four-point enhancement with respect to Caramelli's role in the gambling operation, pursuant to U.S.S.G. § 3B1.1(a). However, the government respectfully submits that the role enhancement does not apply because Caramelli, though he was responsible for the day-to-day business of the gambling operation, was subordinate to his Bonanno family captain, Anthony Mannone. In addition, the government agreed to recommend a reduction of one point for the global disposition of the case, pursuant to U.S.S.G. § 5K2.0. Plea Ag. ¶ 2. Thus, according to the Plea Agreement, the total offense level is 17, with a corresponding range of imprisonment of 24 to 30 months. Id.

The defendant objects that the PSR improperly describes him as an associate of the Bonanno family. This objection is without merit. The evidence clearly establishes that Caramelli was an associate of the Bonanno family. Both CW1 and CW2, who were prepared to testify at trial, have advised that based on their conversations with Caramelli, they understood him to be an associate of the Bonanno family and in particular, of Bonanno family captain Anthony Mannone. Caramelli's involvement with Mannone and the Bonanno family was not a singular instance, as he suggests in his letter. Rather, as set forth above, Caramelli operated a gambling operation for the benefit of the Bonanno family and, as a result of his relationship with Mannone and his position as an associate in the Bonanno family, was able to secure Mannone's support and assistance in his efforts to collect the debt from CW1.

This information is corroborated by the statements Caramelli made during consensually recorded conversations with CW1 and CW2. In the threats he communicated to CW1, Caramelli explicitly referred to his relationship with Mannone in an effort to convey the seriousness of the risk to CW1's safety. During

4

the February 16, 2009 sit-down, one of two that Caramelli attended with Mannone, Mannone confirmed that Caramelli was his associate, referring to Caramelli as "my guy." Caramelli further expressed the nature of his relationship with Mannone, as well as his willingness to engage in violence, during a conversation consensually recorded by CW2 on April 5, 2009. During that conversation, Caramelli indicated that he had to obtain Mannone's permission before he could physically hurt CW1, and expressed his desire to "knock[] him [CW1] out" and "hit him with a fucking bat."

III. Sentencing

The defendant requests a sentence below the applicable Guidelines range based on his devotion to his family and his participation in community service. However, in the Plea Agreement, the defendant stipulated to a Guidelines range of 24 to 30 months and agreed not to seek a sentence below 24 months' incarceration (Plea Ag. ¶ 2), and for the reasons set forth below, the government respectfully submits that a sentence within the Guidelines range is appropriate.

   A.   Nature of the Offense

Caramelli's threats against CW1 were explicit and chilling. Caramelli characterizes these threats as expressions of frustration (Def. Let. at 2), but Caramelli explicitly and repeatedly threatened CW1's safety. For example, as set forth above, Caramelli threatened that if CW1 did not pay within 24 hours, Mannone was "prepared," meaning that Mannone was prepared to physically harm CW1. Caramelli further stated that Mannone had tried to "do it the nice way," but because CW1's payment was not forthcoming, "this is not gonna end good," meaning that CW1 would be hurt or even killed. The government respectfully submits that these threats were much more than expressions of frustration. Rather, they were powerful threats intended to communicate to CW1 that Caramelli and Mannone were ready to use violent means to collect the debt and that failure to pay would seriously jeopardize CW1's physical safety.

Caramelli argues that CW1 was never physically harmed (Def. Let. at 2), and that Caramelli "poses no risk to the public." (Def. Let. at 8). Yet, due to the nature of the threats, the FBI was so concerned for CW1's safety, that agents intervened to advise Caramelli, Mannone and others that CW1 was cooperating with the government. The government respectfully submits that a sentence within the Guidelines' range is an appropriate punishment that reflects the seriousness of the

defendant's conduct and addresses the need for both specific and general deterrence.

### B. Family Circumstances

The defendant's submission focuses on the negative impact that incarceration will have on his family, and in particular, on his children. Although the Guidelines are of course advisory, the pertinent Guidelines policy statement provides that "family ties and responsibilities are not ordinarily relevant" (U.S.S.G. § 5H1.6), and the cases interpreting the Guidelines provide that family ties and relationships warrant a downward departure only when truly extraordinary. See United States v. Galante, 111 F.3d 1029, 1033 (2d Cir. 1997). Absent extraordinary circumstances, courts are discouraged from downwardly departing based upon family circumstances. Galante, 111 F.3d at 1034; United States v. Johnson, 964 F.2d 124, 128 (2d Cir. 1992) ("Disruption of the defendant's life, and the concomitant difficulties for those who depend on the defendant, are inherent in the punishment of incarceration.").

Such extraordinary circumstances are present where family members are "uniquely dependent" upon a defendant for financial or emotional support. United States v. Faria, 161 F.3d 761, 762 (2d Cir. 1998). In Faria, the Second Circuit reaffirmed its position that adverse consequences to a family, even a family that includes young children, due to a defendant's incarceration do not warrant a downward departure without truly exceptional circumstances. Id. at 763. In this case, while the defendant's incarceration will surely impact his children, they are not uniquely dependent on him emotionally, physically, or financially. Indeed, it is apparent from the letters submitted on Caramelli's behalf that the children have a substantial support network. Thus, the government respectfully submits that the defendant's family circumstances do not support a sentence below the applicable Guidelines range.

### V. Conclusion

For the reasons set forth above, and in accordance with the factors set forth in 18 U.S.C. § 3553(a), the government

6

respectfully submits that the Court should impose a sentence within the applicable Guidelines range of 24 to 30 months.

                                        Respectfully submitted,

                                        LORETTA E. LYNCH
                                        United States Attorney

                              By:      /s/
                                        Rachel J. Nash
                                        Assistant U.S. Attorney
                                        (718) 254-6072

cc:   Joseph R. Conway, Esq., via ECF
      Michael Dorra, U.S. Probation, via ECF